# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| ROBERT DEE SCRIBNER, II,      ) | |
|                       ) | |
|     Petitioner,         ) | |
|                       ) | |
| v.                         ) | No. 3:13-cv-01423 |
|                       ) | Judge Trauger |
|                       ) | |
| MICHAEL DONAHUE, Warden,     ) | |
|                       ) | |
|     Respondent.       ) | |

## MEMORANDUM

The petitioner, Robert Dee Scribner, II, a state inmate, filed this pro se action under 28 U.S.C. § 2254, seeking the writ of habeas corpus to set aside his state conviction for raping a child under the age of thirteen. (Docket Entry No. 1). The court appointed the Federal Public Defender to represent the petitioner and permitted the filing of an amended petition. (Docket Entry Nos. 28, 47). The court later granted appointed counsel the opportunity to obtain discovery. (Docket Entry No. 59). The petitioner then filed a Second Amended Petition (Docket Entry No. 79), in which the petitioner asserts the following claims: (1) the evidence at his trial was insufficient to support a conviction; (2) trial counsel was ineffective for failing to present any evidence regarding the petitioner's subjective awareness of the child's age, including failing to object to the State's motion in limine that precluded counsel from presenting or eliciting testimony about the petitioner's lack of knowledge of the child's age; (3) state post-conviction counsel was ineffective for failing to assert that trial counsel was ineffective for failing to present any evidence regarding the petitioner's subjective awareness of the child's age; and (4) the State withheld material, exculpatory evidence, in violation of Brady v. Maryland, 373 U.S. 83 (1963). Id. at 14, 15, 18. The petitioner also asserts

that the Second Amended Petition incorporates all other claims raised in the petitioner's pro se petition by reference and supplements, but does not supersede, the initial petition. Id. at 23.[1,2]

Before the court is the respondent's Motion to Dismiss (Docket Entry No. 84) and proposed findings of fact and conclusions of law (Docket Entry No. 104). The respondent contends that the petitioner's claims are time-barred and that he has failed to show good cause for equitable tolling or that he is actually innocent. (Docket Entry No. 85, at 1). As to the Brady claim, the respondent also contends that the petitioner's Brady claim fails because the petitioner cannot show that the evidence was suppressed, exculpatory or impeaching, or that he suffered prejudice. (Docket Entry No. 104, at 1, 21). In his response (Docket Entry No. 88) and proposed findings of fact and conclusions of law (Docket Entry No. 105), the petitioner contends: (1) that the respondent waived the statute of limitations defense for his non-Brady claims, and the court should consider this claim in the interests of justice; (2) that the evidence was insufficient for his conviction for the rape of a child; (3) that trial counsel rendered ineffective assistance of counsel for failing to object to the State's motion in limine precluding him from presenting or eliciting testimony about the petitioner's

---

[1]"Generally, amended pleadings supersede original pleadings." Hayward v. Cleveland Clinic Found., 759 F.3d 601, 617 (6th Cir. 2014). "This rule applies to habeas petitions." Braden v. United States, 817 F.3d 926, 930 (6th Cir. 2016) (citing Calhoun v. Bergh, 769 F.3d 409, 410 (6th Cir. 2014) cert. denied sub nom. Calhoun v. Booker, --U.S. --, 135 S.Ct. 1403 (2015)). Yet, the Sixth Circuit has "recognized exceptions to this rule where a party evinces an intent for the amended pleading to supplement rather than supersede the original pleading, and where a party is forced to amend a pleading by court order. Id. (citations omitted). "An amended pleading supersedes a former pleading if the amended pleading 'is complete in itself and does not refer to or adopt a former pleading[.]'" Id. (citations omitted). The petitioner's counsel specifically states that the Second Amended Petition incorporates and supplements the petitioner's prior claims. Thus, the court must address the claims in the petitioner's initial petition as well.

[2]This practice is not favored by the court. Supplemental pleadings filed by appointed counsel, which neither develop nor withdraw earlier pro se claims, do not relieve the court or other parties of the challenge of addressing pro se filings.

lack of knowledge as to the child's age and that post-conviction counsel was ineffective for failing to raise this issue before the state courts; and (4) that the petitioner has established the elements of a <u>Brady</u> violation. (Docket Entry No. 105, at 26, 30, 13-15, 19-23).

## I. PROCEDURAL HISTORY

On August 29, 2007, a Davidson County Criminal Court jury convicted the petitioner of rape of a child, for which the petitioner was sentenced to sixteen (16) years of imprisonment to be served at 100 percent. (Docket Entry No. 31-1 at 65-66, 72).[3] The Tennessee Court of Criminal Appeals affirmed the petitioner's conviction and sentence. <u>State v. Turner</u>, No. M200800253CCAR3CD, 2009 WL 648963, at *1 (Tenn. Crim. App. Mar. 12, 2009). On August 17, 2009, the Tennessee Supreme Court denied the petitioner's application for permission to appeal. <u>Scribner v. State</u>, No. M2011-00229-CCA-R3-PC, LEXIS 485, at *2 (Tenn. Crim. App. June 19, 2012).

On January 11, 2010, the petitioner filed a <u>pro se</u> post-conviction petition in the Criminal Court for Davidson County, followed by appointment of post-conviction counsel and the filing of an amended petition on June 16, 2010. <u>Id</u>. at *4. The state trial court conducted an evidentiary hearing and, on December 2, 2010, it denied the petitioner's petition for post-conviction relief. <u>Id</u>. at *4-6. On June 19, 2012, the Tennessee Court of Criminal Appeals affirmed the trial court's denial of post-conviction relief. <u>Id</u>. at *1. On October 17, 2012, the Tennessee Supreme Court denied the petitioner's application for permission to appeal. <u>Id</u>.

On October 16, 2013, the petitioner filed his <u>pro se</u> federal habeas petition. (Docket Entry No. 1, at 47). On July 28, 2014, the petitioner's court appointed counsel filed an Amended Petition

---

[3]Unless stated otherwise, the citations to the record reference the court's ECF pagination.

(Docket Entry No. 47).  On January 16, 2015, the court granted appointed counsel permission to seek discovery from the Metropolitan Nashville Police Department ("MNPD") and the Tennessee Department of Children's Services ("DCS").  (Docket Entry No. 59).  The respondent produced requested documents to the petitioner on or around April 15, 2015.  (Docket Entry No. 94, at ¶ 5).  On July 24, 2015, the court granted the petitioner's motion to file a Second Amended Petition, which was accompanied by trial counsel's sealed declaration and six attachments, five of which the petitioner alleges were withheld in violation of Brady.  (Docket Entry No. 79).  On August 28, 2015, the respondent filed a Motion to Dismiss (Docket Entry No. 84) and, after being granted an extension of time to respond, on September 18, 2015, the petitioner filed his response.  (Docket Entry Nos. 87 and 88).

On January 15, 2016, the court ordered an evidentiary hearing on the petitioner's "Brady claim that may toll the applicable statute of limitations."  (Docket Entry No. 89).  On March 15, 2016, the court conducted the evidentiary hearing.  (Docket Entry No. 96).  The parties filed their proposed findings of fact and conclusions of law on July 11, 2016.  (Docket Entry Nos. 103-105).  Due to the retirement of Judge Haynes on January 16, 2017, and pursuant to Administrative Order No. 138, this action was transferred to the undersigned.  (Docket Entry No. 106).

## II.  REVIEW OF THE STATE COURT RECORD

On the petitioner's direct appeal, the Tennessee Court of Criminal Appeals found the following facts[4]:

---

[4]State appellate court opinion findings can constitute factual findings in a habeas action and have a statutory presumption of correctness under 28 U.S.C. § 2254(e).  Sumner v. Mata, 449 U.S. 539, 546-47 (1981); Matthews v. Ishee, 486 F.3d 883, 889 (6th Cir. 2007) ("The presumption of correctness also applies to factual findings made by a state appellate court based on the trial record.").

The defendants, Eric D. Turner and Robert Dee Scribner, II, were indicted by the Davidson County Grand Jury in a three-count indictment for rape of a child, a Class A felony, with Scribner charged with two counts and Turner charged with one count.

. . . .

This case arises out of the defendants' January 24, 2006, sexual encounter with the twelve year-old victim, A. D. According to the State's proof at trial, the victim became acquainted with twenty-three-year-old Turner and his twenty-two-year-old cousin, Scribner, through an adult chat line. On January 24, 2006, by prearrangement with the victim, the men picked up the victim from the street near her home and took her to Turner's house. Both men engaged in sexual activity with the victim at Turner's house and then took her back to her own home. Confronted by her mother that evening, the victim initially admitted to penile-vaginal intercourse with Scribner. A criminal investigation ensued, and she eventually admitted that she had engaged in sexual intercourse with both defendants during the January 24, 2006, episode at Turner's home.

At the defendants' August 27-28, 2007, joint trial, Metro Police Sex Crimes Detective Heather Baltz testified that she went to the victim's home on January 24, 2006, in response to a patrol officer's report of a child that might have been involved in a criminal sexual situation. After speaking with the victim and her mother, she accompanied the victim to the hospital, where a physical examination was performed and evidence collected for a rape kit. Detective Baltz stated that she took custody of the rape kit evidence and followed the standard practice of booking it into the Metro Police Property Room, where it was assigned a case number that was on all the paperwork connected with the evidence. She then transported the evidence to the Tennessee Bureau of Investigation ("TBI") laboratory for analysis, where the TBI assigned its own internal reference numbers to it.

Detective Baltz testified that the victim provided her with the nicknames, "Kelondo" and "Little Daddy," later identified as Turner and Scribner, respectively. The victim initially mentioned only that she had engaged in penile-vaginal intercourse with Scribner but, during the course of her subsequent interviews, which occurred on February 10, February 14, and April 13, stated that she had sexual intercourse with both men. Detective Baltz testified that she interviewed each defendant, using a casual, non-confrontational approach designed to get them to open up about the incident. She laid out the victim's allegations to Turner, "present[ing] it as if they did have sex." He did not deny it, and when she asked Turner if he had used a condom, he replied that he did not remember. She took the same approach with Scribner, who ultimately acknowledged that he had oral sex with the victim but continued to deny that he had engaged in vaginal sex with her. Detective Baltz stated that she collected cheek swabs from each defendant, which she submitted for DNA

analysis. The tape recording of both interviews was played aloud for the jury and admitted into evidence.

On cross-examination, Detective Baltz acknowledged that each man expressed surprise, with Scribner appearing "extremely surprised," when she revealed the victim's age. She further acknowledged that the victim initially told her that she first met Turner at a convenience store, called Scribner to come pick her up, and had vaginal intercourse with Scribner. She confirmed that the victim did not tell her that she had sexual intercourse with Turner until the February 10 interview and did not admit to having met him on a chat line, rather than in a store, until the April 13 interview. She said that the victim explained that she knew she should not have been on the adult chat line and was afraid that she would get in trouble for having used it.

Detective Baltz testified that she did not ask the victim on January 24 if she had sexual relations with Turner but began to suspect as the night wore on that she had intercourse with both defendants. She said she interpreted Turner's statements that he was not going to lie about it and that he "got with" the victim as an admission that he had engaged in some type of sexual activity with her. She stated that when she confronted Scribner with the victim's allegation that they had sex three times, he denied vaginal sex but "seemed very comfortable ... admitting oral sex" until she explained to him that oral sex was a crime.

The victim testified that her date of birth was March 18, 1993, and that she was currently fourteen years old. She said that she became acquainted with Turner in December 2005 or January 2006 after calling a chat line advertised on television and that she told him she was sixteen years old. She talked to him more than once on the telephone and then arranged for him to pick her up down the street from her home. When he arrived, Scribner was in the vehicle with him. They took her to Turner's house, where all three of them went into Turner's bedroom and she sat on the bed. Turner asked her if she wanted to have sex, and she said yes. She lay down and Turner had sex with her, putting his "private part" inside her. She then had sex with Scribner as well, performing oral sex on him and engaging in vaginal intercourse. She had sex "more than one time" with both Scribner and Turner that day. Turner played a pornographic movie on the television during part of the time she was in his bedroom. Afterwards, both men took her home.

On cross-examination, the victim testified that she had been talking with Turner on the chat line for about two weeks before the incident occurred. She had never spoken to Scribner before meeting him that day. She denied that she told the men that she was eighteen and employed. She said that both Scribner and Turner remained in the bedroom during the entire episode.

Sue Ross, a pediatric nurse practitioner with Our Kids Center in Nashville, testified that she examined the victim at General Hospital on January 24, 2006. She said she

found nothing of note in her genital examination of the victim but explained that was not unusual due to the elasticity of the tissue in a child who has already gone through puberty. She collected oral, vaginal, and cervical swabs as part of the rape kit, and her records reflected that she placed the evidence in the hospital's lock box for later collection by the detective investigating the case. Ross identified the evidence she had collected by, among other things, the packaging in which she had wrapped it and the hospital seal she had placed across the envelopes.

TBI Special Agent Forensic Scientist Charles Hardy identified the rape kit evidence and the defendants' cheek swabs by, among other things, the Metro Police Department case number, as well as the TBI case number that was assigned to the evidence upon its receipt into the TBI Laboratory. He stated that the evidence receiving section of the laboratory would not accept evidence that was not sealed. The unsealed rape kit evidence was boxed and shipped to Bode Technology, a laboratory in Virginia, for analysis, while he processed the cheek swabs internally at the TBI Laboratory in Nashville. A single male profile was obtained from sperm recovered from the victim's vaginal and cervical swabs, which, upon comparison, was a "full profile match" to Scribner's DNA. According to Agent Hardy, the probability of an unrelated individual from the African-American, Caucasian, Southeastern, Hispanic, or Southwestern Hispanic population having the same DNA profile exceeded the current world population.

Shana Mills, a forensic scientist with Bode Technology, identified the evidence analyzed in her laboratory and testified that it was sealed when it arrived. She said that her testing revealed the presumptive presence of sperm on the vaginal and cervical swabs. She found no sperm on the oral swab.

Sarah Shields, a DNA analyst at Bode Technology, testified that she isolated the DNA profiles from the victim's oral, vaginal, and cervical swabs, finding the presence of the same male DNA on the cervical and vaginal swabs.

The defendants elected not to testify and rested their cases without presenting any proof.

State v. Turner, No. M200800253CCAR3CD, 2009 WL 648963, at *1-3 (Tenn. Crim. App. Mar.

12, 2009) (footnote omitted).

## III. STANDARD OF REVIEW

## A. EXHAUSTION

Title 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. <u>Cullen v. Pinholster</u>, 563 U.S. 170, 182 (2011). The petitioner must "fairly present"[5] each claim at all levels of state court review, up to and including the state's highest court on discretionary review, <u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 847–48 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in that court in order to "be deemed to have exhausted all available state remedies." <u>Adams v. Holland</u>, 330 F.3d 398, 402 (6th Cir.2003), <u>cert</u>. <u>denied</u>, 541 U.S. 956 (2004); <u>see also</u> <u>Smith v. Morgan</u>, 371 F. App'x 575, 579 (6th Cir. 2010) ("<u>Adams</u> not only requires the federal courts to ensure that the state courts have the first opportunity to review and evaluate legal claims ... but also mandates that the federal courts respect the duly-promulgated rule of the Tennessee Supreme Court that recognizes the law and policy-making function of that court and the court's desire not to be entangled in the business of simple error correction").

This rule has been interpreted by the Supreme Court as one of total exhaustion. <u>Rose v. Lundy</u>, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. <u>Picard v. Connor</u>, 404 U.S. 270

---

[5]For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982) (<u>per</u> <u>curiam</u>) (internal citation omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. <u>Gray v. Netherland</u>, 518 U.S. 152, 163 (1996).

(1971); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. Gray v. Netherland, 518 U.S. 152, 162–63 (1996). Fair presentation requires that the state courts be given the opportunity to see both the factual and legal basis for each claim. Wagner v. Smith, 581 F.3d 410, 414 (6th Cir. 2009). For the claim to be exhausted, it must be presented to the state courts as a federal constitutional issue, not merely as an issue arising under state law. Koontz v. Glossa, 731 F.2d 365, 369 (6th Cir. 1984).

Specifically, in determining whether a petitioner "fairly presented" a federal constitutional claim to the state courts, federal courts should consider whether the petitioner: (1) phrased the federal claim in terms of the pertinent constitutional law or in terms sufficiently particular to allege a denial of the specific constitutional right in question; (2) relied upon federal cases employing the constitutional analysis in question; (3) relied upon state cases employing the federal constitutional analysis in question; or (4) alleged "facts well within the mainstream of [the pertinent] constitutional law." Hicks v. Straub, 377 F.3d 538, 553 (6th Cir. 2004) (quoting McMeans v. Brigano, 228 F.3d 674, 681 (6th Cir.2000)). Moreover, the claim must be presented to the state courts under the same legal theory in which it is later presented in federal court. Wong v. Money, 142 F.3d 313, 322 (6th Cir. 1998). It cannot rest on a legal theory that is separate and distinct from the one previously considered and rejected in state court. Id. This does not mean that the applicant must recite "chapter and verse" of constitutional law, but the applicant is required to make a specific showing of the alleged claim. Wagner, 581 F.3d at 414.

## B. PROCEDURAL DEFAULT

The procedural default doctrine is ancillary to the exhaustion requirement. See Edwards v. Carpenter, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 81–82 (1977); see also Walker v. Martin, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); Coleman v. Thompson, 501 U.S. 722 (1991) (same).[6] If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. Coleman, 501 U.S. at 731–32; see also Hicks v. Straub, 377 F.3d 538, 551 (6th Cir.2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine), cert. denied, 544 U.S. 928 (2005).

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental

---

[6]"The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." Walker, 562 U.S. at 315. A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." Id. (quoting Beard v. Kindler, 558 U.S. 53, 60–61 (2009)). "A discretionary state procedural rule ... can serve as an adequate ground to bar federal habeas review ... even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." Id. at 1128 (quoting Kindler, 558 U.S. at 60–61) (internal citations & quotation marks omitted).

miscarriage of justice." Coleman, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. Lucas v. O'Dea, 179 F.3d 412, 418 (6th Cir.1999) (citing Coleman, 501 U.S. at 754).

A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986); see also Coleman, 501 U.S. at 753; Maples v. Stegall, 340 F.3d 433, 438 (6th Cir. 2003). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. Murray, 477 U.S. at 488. Second, constitutionally ineffective assistance of counsel may constitute cause under certain circumstances. Murray, 477 U.S. at 488-89; Broom v. Mitchell, 441 F.3d 392, 401 (6th Cir. 2006); Rust v. Zent, 17 F.3d 155, 161 (6th Cir. 1994). In Tennessee, the ineffective assistance of post-conviction counsel can, under limited circumstances, establish cause for the default of a claim of ineffective assistance of trial counsel. Martinez v. Ryan, 566 U.S. 1, 132 S. Ct. 1309, 1320 (2012); Sutton v. Carpenter, 745 F.3d 787 (6th Cir.2014).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. Dretke v. Haley, 541 U.S. 386, 392 (2004) (citing Murray, 477 U.S. at 495-96); accord Lundgren v. Mitchell, 440 F.3d 754, 764 (6th Cir. 2006).

## IV.  CONCLUSIONS OF LAW

## A. STATUTE OF LIMITATIONS DEFENSE

11

The Antiterrorism and Effective Death Penalty Act ("ADEPA") provides a one-year statute of limitations for § 2254 habeas corpus petitions that runs from the latest of four dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D).  The one-year period is tolled during the time in "which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending . . . ."  28 U.S.C. § 2244(d)(2).

The one-year statute of limitations may be subject to equitable tolling, excusing the literal enforcement of the federal habeas statute of limitations if a petitioner shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."  Holland v. Florida, 560 U.S. 631, 649 (2010) (internal quotation marks and citation omitted).  A "petitioner bears the burden of demonstrating that he is entitled to equitable tolling."  Allen v. Yukins, 366 F.3d 396, 401 (6th Cir. 2004).  The Supreme Court has also stated that a "credible showing of actual innocence" may allow a petitioner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief.  McQuiggin v. Perkins, -- U.S. --, 133 S. Ct. 1924, 1931 (2013).  "'[A]ctual innocence' means factual innocence, not mere legal insufficiency."  Bousley v. United States, 523 U.S. 614, 623 (1998).  A petitioner

must show "'it is more likely than not that no reasonable juror would have convicted [the petitioner] in the light of the new evidence.'" <u>McQuiggin</u>, 133 S. Ct. at 1935 (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)).

The petitioner's state court conviction became final on November 15, 2009, ninety (90) days after August 17, 2009, when the Tennessee Supreme Court denied permission to appeal. <u>Pinchon v. Myers</u>, 615 F.3d 631, 640 (6th Cir. 2010). Thus, the petitioner's one-year limitations period under AEDPA began to run on November 15, 2009. The limitations period was tolled after fifty-seven (57) days, upon the filing of his post-conviction petition on January 11, 2010. The limitations period resumed on October 17, 2012, when the Tennessee Supreme Court denied permission to appeal. <u>Lawrence v. Florida</u>, 549 U.S. 327, 332 (2007) ("The application for state postconviction review is . . . not 'pending' after the state court's postconviction review is complete, and § 2244(d)(2) does not toll the 1-year limitations period during the pendency of a petition for certiorari."); <u>Tyler v. Ray</u>, 610 F. App'x 445, 452 (6th Cir.), <u>cert</u>. <u>denied</u> <u>sub</u> <u>nom</u>. <u>Tyler v. Schofield</u>, 136 S. Ct. 239 (2015) (under Tennessee law state post-conviction relief is no longer pending on the date of the Tennessee Supreme Court's decision, not the date of the mandate). Therefore, the petitioner's one-year limitations period expired on August 21, 2013. The petitioner filed his <u>pro se</u> petition in this action on October 16, 2013, approximately fifty-seven (57) days after the expiration of his limitations period.

The petitioner agrees to this calculation of the statute of limitations. (Docket Entry No. 105, at 25) The petitioner does not argue that equitable tolling applies or that he is actually innocent. However, the petitioner argues that the statute of limitations is an affirmative defense that the respondent waived by stating in its answer that the petitioner's petition was timely filed. (Docket

Entry No. 105, at 25). The petitioner argues that the interests of justice would be better served by addressing his claims. Id. at 26.

In its answer, the respondent initially stated that "[t]his is his first petition for habeas corpus relief under 28 U.S.C. § 2254 and it is timely filed." (Docket Entry No. 27, at 2). However, in its first Motion to Dismiss, the respondent asserted that the petition was time-barred by the one-year statute of limitations period under 28 U.S.C. § 2244(d), stating that "[t]he State inadvertently failed to assert this affirmative defense in its initial response to the petitioner's pro se petition." (Docket Entry No. 55, at 1 n.1). The respondent argues that the petitioner's habeas claims should not be deemed timely simply because of counsel's inadvertent error, where the record does not suggest that the State "strategically" withheld the statute of limitations defense or chose to relinquish it. (Docket Entry No. 85, at 5).

"'The AEDPA statute of limitation promotes judicial efficiency and conservation of judicial resources, safeguards the accuracy of state court judgments by requiring resolution of constitutional questions while the record is fresh, and lends finality to state court judgments within a reasonable time.'" Day v. McDonough, 547 U.S. 198, 205-06 (2006) (quoting Acosta v. Artuz, 221 F.3d 117, 123 (2d Cir. 2000)). The Supreme Court has held that "district courts are permitted, but not obliged, to consider, sua sponte, the timeliness of a state prisoner's habeas petition." Id. at 209. To be sure, "before acting on its own initiative, a court must accord the parties fair notice and an opportunity to present their positions." Id. at 210. A court must also "assure itself that the petitioner is not significantly prejudiced by the delayed focus on the limitation issue, and 'determine whether the interests of justice would be better served' by addressing the merits or by dismissing the petition as time barred." Id. Affirming the district court's dismissal, on its own initiative, of a state prisoner's

petition for a writ of habeas corpus as untimely, the Supreme Court in Day noted that "nothing in the record suggests that the State 'strategically' withheld the defense or chose to relinquish it," and that the record reflected that "there was merely an inadvertent error, a miscalculation that was plain under Circuit precedent." Id. at 211.

Here, the record reflects that the respondent's failure to raise the timeliness defense was the result of inadvertent error and that the interests of justice would be better served by dismissing the petitioner's insufficiency of the evidence and ineffective assistance of counsel claims, as well as the claims raised in his pro se petition, as time barred. Soule v. Palmer, No. 08-CV-13655, 2013 WL 450980, at *3 (E.D. Mich. Feb. 5, 2013) ("Mere inadvertence on the part of the respondent in failing to raise this defense at the first opportunity does not establish 'bad faith' or undue prejudice to petitioner nor does it establish an intelligent or deliberate waiver of that defense.") (citing Sudberry v. Warden, Southern Ohio Correctional Facility, 626 F. Supp.2d 767, 782 (S.D. Ohio 2009)).

Accordingly, the court concludes that the petitioner's insufficiency of the evidence and ineffective assistance of counsel claims and the petitioner's claims in his pro se petition are time barred and will be dismissed.

## B. BRADY CLAIM

The petitioner contends that the State withheld material, exculpatory evidence, in violation of Brady v. Maryland, 373 U.S. 83 (1963). Specifically, the petitioner contends that documents from DCS and the MNPD were not disclosed to appointed counsel until after the commencement of this federal action and the expiration of the statute of limitations. The petitioner asserts that these documents from DCS and the MNPD reflect evidence of the sexual history of A.D., the child victim, and evidence that A.D. convincingly lied to adults. (Docket Entry No. 105, at 14, 20). The

petitioner's argument is that "[t]he withheld evidence would have demonstrated to the jury that A.D. acted 'older' than her 12 years and 10 months in two ways: she was considerably more sexually experienced than one would expect for her age, and she was a much more convincing liar than her 'hesitant demeanor' on the stand suggested." Id. at 23. The petitioner also argues that the withheld evidence would have been valuable in convincing the trial judge to issue a clearer jury instruction, which trial counsel requested. Id.

The respondent contends that the petitioner cannot show that the allegedly suppressed information (1) was improperly withheld; (2) was exculpatory or impeaching; or (3) that the evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict when viewed with the entire record. (Docket Entry No. 104 at 1).

## *1. Relevant Facts and Background*

Prior to trial, the petitioner was originally represented by Michael Colavecchio. (Docket Entry No. 96, Federal Evidentiary Hearing Transcript, at 6). During the discovery phase, Colavecchio submitted a discovery request to the State, requesting, among other things, that "[i]n accordance with Brady v. Maryland, 373 U.S. 83 (1963), all items of exculpatory nature, if any there be will be furnished to defense counsel if and when any such item or information becomes known to the State." (Docket Entry No. 96, at 8; Docket Entry No. 88-1, at ¶ 7). The State responded, "None known at this time." (Docket Entry No. 88-1, at ¶ 7). A conflict later arose between the petitioner and Colavecchio, and the trial court appointed David M. Hopkins to represent the petitioner. (Docket Entry No. 96, at 6). At the federal evidentiary hearing, Hopkins testified that the State did not provide any additional Brady evidence in discovery. Id. at 9.

In pretrial motions, the State filed a motion in limine requesting that the court "instruct defense counsel not to ask any questions or make statements before the jury at any stage including voir dire and opening statement relating to any prior sexual activity of the victim" under Rule 412 of the Tennessee Rules of Evidence. (Docket Entry No. 31-1, motion in limine No. 2, at 17). As to the trial court's granting of this motion, the trial record reflects the following:

> THE COURT: . . . . That motion will have to be granted. I don't think you can get into that.
>
> MR. HOPKINS: Could I be heard on that just briefly. Should – should the witness, [A.D.] testify to the contrary, of course, she would be allowed to be impeached if she had actually had prior activity.
>
> . . . .
>
> MR. HOPKINS: If she testifies, that, no, I've never had any prior sexual activity, but, when there's proof that she has.
>
> THE COURT: In other words, if she opens that door.
>
> MR. HOPKINS: If she opens the door.
>
> THE COURT: Okay. Yeah, that a different thing. That goes to credibility.
>
> MR. HOPKINS: Right.
>
> THE COURT: So, if she does that, true. But, in other words, if she's had sexual issues before, if she is, in fact, under thirteen wouldn't come out unless something like that happens. So, I mean, it's not a point if she consented to this or whether she's had prior little problems, it's whether or not there was sex between someone over the age and someone who's thirteen. But, if she brings that out, then that's – that's – I understand what you're saying. So, granted, except if the door is open under – by the victim, allegedly – I mean, the defendants, I'm sure you've talked with them and they understand that's no a defense in the case, a child under thirteen? They're aware of that under the law?
>
> MR. HOPKINS: Yes, Your Honor. I've advised my client of that.

(Docket Entry No. 31-2, State trial transcript, at 11-12).

The State's motion in limine no. 6 requested that the court "instruct defense counsel not to present any evidence or ask any questions to elicit statements or ask any questions in voir dire concerning the issue of consent or lack of knowledge of the victim's age." (Docket Entry No. 31-1, motion in limine No. 6, at 24). Trial counsel did not object to this motion in limine, and the trial court granted it. (Docket Entry No. 31-2, at 15-16).

Trial counsel later requested the following jury instruction: "'The victim's age is a circumstance surrounding the conduct. The defendant must have acted knowingly or recklessly with regard the victim's age before you can find the defendant guilty of rape of a child.' This request is made pursuant to State v. Walters, 2004 WL 2726034 at *13 (Tenn. Crim. App. Nov. 30, 2004)." (Docket Entry No. 31-1, at 38). The trial court gave the following instructions:

> For you to find the defendant, or either of them, guilty of [rape of a child], the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) that the defendant, or either of them, had unlawful sexual penetration of the alleged victim or the alleged victim had unlawful sexual penetration of a defendant; and (2) that the alleged victim was less than thirteen years of age; and (3) that the defendant, or either of them, acted either intentionally, knowingly or recklessly [;]
>
> … .
>
> "Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. *The victim's age is a circumstance surrounding the conduct.* A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.
>
> "Recklessly" means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards, a substantial and unjustifiable risk that the circumstances exist or the result will occur. *The victim's age is a circumstance surrounding the conduct.* The risk must be of such a nature and degree that its disregard constitutes

a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Id. at 43-44 (emphasis added).

On direct appeal, addressing the petitioner's insufficiency of the evidence claim that there was no proof that he acted knowingly or recklessly with regard to the victim's age, the Tennessee Court of Criminal Appeals concluded:

The evidence establishes that Scribner had sexual intercourse with a twelve-year-old child he had just met, and with whom he had never before spoken, without making any efforts to ascertain her true age. While the victim may, arguably, appear older than twelve in the photograph admitted into evidence, taken on the day of the incident, she appears far younger than sixteen, the age she gave when meeting the defendants. In addition to the photograph, the jury had the benefit of seeing the victim's demeanor and appearance at trial, where her testimony was hesitant and difficult to elicit. From this evidence, the jury could have found beyond a reasonable doubt that, at the time Scribner had sexual intercourse with her, he was aware of, and consciously disregarded, a substantial and unjustifiable risk that she was less than thirteen years old. We conclude, therefore, that the evidence was sufficient to sustain the jury's verdict finding him guilty of rape of a child.

Turner, 2009 WL 648963, at *6.

During the petitioner's federal habeas proceedings, the court granted appointed counsel's motion to conduct discovery from MNPD and DCS. (Docket Entry No. 59). The respondent produced requested documents to the petitioner on or around April 15, 2015. (Docket Entry No. 94, at ¶ 5). The petitioner asserts that some of these documents were withheld in violation of Brady. Id. at ¶ 6. The petitioner filed a Second Amended Petition for a writ of habeas corpus, (Docket Entry No. 79), accompanied by a sealed declaration of Hopkins and several of the documents produced in discovery. (Docket Entry No. 73, Hopkins Declaration). The court ordered an evidentiary hearing on the petitioner's Brady claim "that may toll the applicable statute of limitations." (Docket Entry No. 89).

Hopkins was the only witness who testified at the evidentiary hearing. Hopkins testified that his defense strategy at trial was to show that the petitioner could not have known the age of the victim at the time of the crime and therefore the petitioner did not act knowingly or recklessly with regard to A.D.'s age. (Docket Entry No. 96, at 12, 36-37). Hopkins's declaration and its six attachments (Docket Entry No. 73) were presented as exhibits at the federal evidentiary hearing. (Docket Entry Nos. 95 and 96). Of the six attachments, Hopkins testified at the federal evidentiary hearing that the State provided appendix 6 to trial counsel prior to the petitioner's criminal trial. (Docket Entry No. 96, Evidentiary Transcript, at 10; Docket Entry No. 73, at 6). In his declaration, Hopkins also attests that the State produced in discovery one of the three documents included in appendix 5, the document entitled "Child Protective Investigative Team Case Summary" that listed the "investigative team" involved in the case. (Docket Entry No. 73, at 6).

The petitioner asserts that the use of these appendices fall into four categories relevant to his Brady claim: (1) background documents (Appendices 1 & 2); (2) documents suggesting that A.D. had an unusually significant sexual history for a girl under the age of 13 (Appendices 3, 4, & 6); (3) documents suggesting that A.D. was convincing in her misrepresentations to adults (Appendices 3, 4, & 6); and (4) documents demonstrating that DCS was part of the investigative team such that the prosecution can be charged with failing to produce the documents (Appendix 5). (Docket Entry No. 105, at 14).

Appendix 1

Appendix 1 is a DCS document where A.D. reports that her grandmother's husband touched her sexually a "couple of times" when A.D. "was 7 or 8 years old" and was living at her grandmother's house while her mother was in jail. (Docket Entry No. 73-1 at 3). Hopkins testified

20

that the relevance of this document is that he would have filed a motion under Rule 412 of the Tennessee Rules of Evidence to see if he could raise on direct A.D.'s "knowledge of sexual things" prior to meeting the petitioner. (Docket Entry No. 96, at 13). Hopkins acknowledged having to "get around the rape shield statute." Id. Hopkins also testified that he would have used this document to support his requested jury instruction. Id. On cross examination, Hopkins admitted that appendix 1 did not address anything A.D. would have said or done on the day of the offense. Id. at 48. Nor was there anything in appendix 1 that contradicted A.D.'s testimony. Id. at 50-51.

<u>Appendix 2</u>

Appendix 2 is a DCS report dated September 4, 2005, that reflects the following:

Referent/Relationship to Child:

> Referent states: [A.D.] has been staying with a former family member, [] (ex aunt-in-law), for about 2 years because her mother [] is homeless and on drugs. [A.D.'s mother] came over tonight looking for money and drugs. [A.D.'s mother] asked [A.D.] for money. [A.D.'s mother] went rambling through [A.D.'s] drawers. [A.D.] went running outside and [A.D.'s mother] gave chase. [A.D.] tripped and fell down. [A.D.'s mother] grabbed [A.D.] by the throat, took her into the house, and threw her on the bed. [A.D.] does not have any obvious signs of injury. [A.D.'s mother] is reportedly living at a crack house down the street from [A.D.'s aunt]. [A.D.'s mother] has since left the residence. There were two witnesses to the incident.

(Docket Entry No. 73-2, at 3).

As to the relevance of this report, Hopkins testified that this information was probative as to the environment in which A.D. lived and that it was impeaching, as A.D.'s mother "was . . . trying to portray herself as some loving, caring mother when she discovered this and was shocked that something like this had happened to her daughter." (Docket Entry No. 96, at 18). Hopkins did not question the victim about her mother's role in the investigation of the crime. Id. at 53. A.D.'s mother was not called as a witness at trial. Id. at 50.

On cross examination, Hopkins admitted that appendix 2 could not have been used to show that A.D. was a liar or had previous sexual experience or that it could have been used to support Hopkins's proposed jury instruction. Id. at 52-53. Hopkins testified that nothing in sealed appendix 2 would have contradicted the victim's trial testimony. Id. at 53.

### Appendix 3

Appendix 3 are DCS reports dated December 21, 2005, noting the following:

Referent states:

A lady about 26years of age brought [A.D.] to the hospital on 12/21/05 at 3:02am. The lady reported that the child had been sleeping on her couch. The child's mother was her legal guardian. However, the mother had been using [A.D.] as income to buy drugs. The mother has been selling the child as a prostitute for a significant amount of time. Tonight, [A.D.] took four Trazodones pills in an attempt to commit suicide. [A.D.] stated that she did not want to live any more and that her father was in prison. The police have been contacted. Dr. David Lee will examine the child. The child has a history of seeing a psychiatrist since she was on medication for depression.

(Docket Entry No. 73-3, at 3).

Based upon this information, a DCS case manager interviewed A.D. and A.D.'s mother and reported the following:

Interview with mother:

CM spoke with [A.D.'s mother] and she states that [A.D.] stayed the night with a friend and she was upset that she hasn't heard from her dad (he's in prison) and she believes that something had happened to him. Mom denies allegations of environmental neglect and sexual abuse exploitation. [A.D.'s mother] submitted to a drug screen and she passed, she says that she has been drug free since 08/05.

Interview with child:

CM spoke with [A.D.] and she states that she wasn't trying to kill herself and she took 3 sleeping pills to help her go to sleep. Says that she had been depressed because her dad is in prison and he usually writes her at least 2 letters per month, however she hadn't heard from him for the past month and she has been worried that something bad has had happened to him.

Summary:

Based on the above information CM does not find sufficient evidence to support the above allegations.

. . . .

Additional information

[A.D.] denies that she made any sexual abuse allegations. [A.D.] states that she wants her mom to get her own place so that she can have her own room.

Id. at 7-9.

Hopkins testified that the allegation that A.D's mother prostituted A.D. for drugs was relevant to show that, based upon A.D.'s sexual knowledge, the petitioner would not have had cause to believe that she was under the age of 13 and therefore had not acted recklessly. (Docket Entry No. 96, at 19). Hopkins also testified that this information could have been used to impeach A.D.'s mother. Id. However, A.D.'s mother was not called as a witness at trial. Id. at 50. Hopkins also acknowledged that "referent," not A.D., made the allegation regarding prostitution. Id. at 57-59.

<u>Appendix 4</u>

Appendix 4 is a July 28, 2006, mental health assessment from Omni Visions that reports the following:

Background Information:

We started off discussing her current situation and family history. [A.D.] was brought into custody in May, 2006 after getting into an argument with her aunt and uncle, [] during which she hit her uncle, was arrested for simple assault, and placed in detention. She came into custody when her aunt and uncle refused to take her back to their home. She was placed with foster parent, [], where she currently still resides. Her current foster home has been a good placement for her and she hasn't had any major problems since she was placed there. Her mother, [](age 35) currently lives with her fiance, . . . with his parents. He just got out of jail. They have been together for 2 years and are planning to get a house in August. Her mother is pregnant with his child and they have another child together [] who is 2 years old. Her mother has

been a crack addict for as long as [A.D.] can remember. Her mother is also bipolar. Her father, [] (age 40) has been in prison since she was 3. She saw him when she was 12 and wants to see him again. He has lupus and is going blind. She doesn't know why he is in jail. She lived with her mother and grandparents when she was little but they died (doesn't remember when). She has lived with her mother but they both stayed with either her grandparents or her aunt and uncle who live in Pegram. . . . She and her mother spend weekends with her aunt, uncle and brothers in Pegram. She talks to her mother every day and is very close to her. [A.D.'s mother] is currently in an outpatient drug treatment program and has been clean for over 3 months.

. . . .

Relationship History:

[A.D.] does not currently have a boyfriend. She had a boyfriend, Barry, for 1 month, who was 16 years old but this ended when she moved. **She has had 4 sexual encounters. The first time, she was molested by her grandmother's husband. She reported it and he was arrested and went to jail. In December, 2005, she was forced to have sex by a 22 year old man. She told her mother who called the police. He is now in jail. She had consensual sex with her boyfriend, Barry and then one other time after custody with a 16 year old boy who her cousin set her up with, which was also consensual.**

Mental Health/Treatment History:

[A.D.,] is currently seeing Behavior Specialist, Kathy Quinn, who works with she and her foster mother on anger management, depression symptoms, and sex education. She also receives weekly sex abuse therapy at the Rape and Sexual Abuse Center. She had been seeing a therapist at the Mental Health Coop to work on anger issues. She saw a Psychiatrist at Centerstone who managed her medication. **The day after Christmas, she was hospitalized at Tennessee Christian Medical Center after overdosing on her antidepressants (trasadone). She stayed there for 7 days. She describes this period of time as one of the worst in her life. In December, 2005, she was raped and her mother was back on crack, having severe mood swings and living on the streets. This was the month she got drunk and blacked out. She felt hopeless and depressed at this time.** Now, she feels like she is back on track and does not feel depressed. She hasn't taken any medication for one and a half months and feels that she doesn't need it at this time. Her mood was very up-beat and positive. She was open to answering my questions and describes herself as being a happy person most of the time now. She did have one incident last month when she got angry with another foster child in her home for calling her boyfriend and finding out information about him. This led to him not wanting to see her. So she put a knife to her neck. Her foster mother and Behavior Specialist were able to talk to her and

she claimed that she was not intending to hurt herself but wanted to get everyone's attention because she was so mad. The other foster child moved out and [A.D.] was able to process the event and get back to normal.

(Docket Entry No. 73-4, at 2-3) (emphasis added).

Hopkins testified that the relevant part of appendix 4 pertained to A.D's relationship history that described sexual encounters with a boyfriend and a forced sexual encounter with a 22-year old man. (Docket Entry No. 96, at 22). Hopkins testified that he would have used this information to show that based upon the number of times that A.D. had been sexually active "she would have knowledge and experience that would not lead someone to believe that she was the age that she was." Id. at 24. On cross examination, Hopkins admitted that the reference to "a 22-year old man" may have been in relation to the petitioner. Id. at 60.

## Appendix 5

Appendix 5 consists of three documents produced by MNPD regarding the investigation of A.D.'s case. The first is a February 10, 2006, email from Detective Heather Baltz to Autumn Moultry, a DCS case manager assigned to A.D.'s case, describing a site-visit at A.D.'s house. This email reflects the following:

Hi Autumn,

I went to the house and spoke with [A.D.] tonight. Her mom was there and obviously high on crack when I visited . Her aunt [], whose house it is, was reputable and sober and agreed that [A.D.] could stay there. Here's the update after I talked with her tonight:

1. She called Kelando and he picked her up from school property. They went to his house and she had sex FIRST with Little Daddy, THEN with Kelando, then again with Little Daddy. All of this happened in Kelando's bed. She also gave oral sex to Little Daddy, but not Kelando.

2. We went to Jefferson St. with [A.D.] and drove around. She knew where to turn, and we turned down Warren St. [A.D.] identified 1012 Warren St. as the house where she went that day.

3. [A.D.] gave me more detail about the vehicle that Kelando drives. It wasn't there when we first drove by, but I went back later tonight and it was there. It was just as she described it. I ran the tag, and it is registered to a female at a different address.

4. [A.D.] said her mom is still on the streets and shows up every once in a while. She said that there is a lady from St. Louis coming to Nashville this weekend. This lady's name is Debbie, and that is all she knows. [A.D.] said she has talked to this lady on the phone and she plans on living with this lady in Hendersonville when she gets here. I told [A.D.'s] mother that it is IMPERATIVE that [A.D.] stays at [A.D.'s aunt's house] until DCS interviews her. She promised to keep [A.D.] there until at least Monday.

(Docket Entry No. 73-5, at 2).

Hopkins testified that the relevancy of this document was to support the allegation in appendix 3 about A.D.'s mother prostituting A.D. to get drugs and to challenge the mother's credibility. Id. at 24-25, 69.

The second document is a "Child Protective Investigative Team Case Summary," describing the "investigative team" looking into the crime. The team is listed as (1) MNPD Detective Baltz, (2) DCS Case Manager Sandra Simms, and (3) Assistant District Attorney General Brian Holmgren. (Docket Entry No. 73-5, at 3). Hopkins attests that the State produced this document in discovery. (Docket Entry No. 73, at 6). This document provides, in part, the following:

C. Summarize the victim interview or disclosure (if performed by MPD officer).
Victim skipped school to hang out with two suspects. She went to Turner's house and had "voluntary" vaginal sex with Turner once. She also had "voluntary" vaginal sex with Scribner twice and oral sex with Scribner once. Suspects then returned her at the end of the day.

D. Summarize the suspect interview (if performed by MPD officer).
Both suspects interviewed. Turner is cooperative and acknowledges having vaginal/penile sex with victim. He was shocked to find out she was 12. Victim said

she told the men she was 15, but Turner states she said she was 18. He said he thought she might be younger, but had no idea she was 12.
Scribner acknowledges oral sex with the girl, but states they met on a chat line for adults over 18. Since he met her on the chat line, he thought she was of age. He claims to have no idea that she was 12. Scribner did not deny vaginal sex, but would not confess to it either.

E. Summarize any other pertinent information or factors that support the investigative effort performed by MPD case officer.
[A.D.] is currently living with a family friend in Hendersonville due to a drug situation with her mother. She is supposedly going to school in Hendersonville and her mother has not taken an active roll in this investigation.

(Docket Entry No. 73-5, at 3-4).

Hopkins testified that the paragraph pertaining to A.D. not living at home because of a drug situation with her mother supported the allegation about A.D.'s mother's activities and "what her mother was making her do." (Docket Entry No. 96, at 25). However, Hopkins did not question the victim about her mother's role in the investigation of the crime or of any alleged drug use. Id. at 53. A.D.'s mother was not called as a witness at trial. Id. at 50.

The third document is an email from Detective Baltz to Sergeant Keith Elliott in which Detective Baltz expresses her concerns regarding [A.D.'s] case. This email reads:

Sgt. Elliott,

I have some concerns regarding the [A.D.] case. [A.D.] is a 12 year old girl who skipped school and had sex with two men, both 22 years old. She has an unfortunate situation, considering that her mother is addicted to crack cocaine and has been living on the streets since the end of January 2006. [A.D.] used to be living with family in Hermitage with her mom, but when mom returned to the streets and her drug habit, [A.D.] was forced to fend for herself. She is currently living with her Aunt [] in East Nashville, but I have spoken with [A.D.'s aunt] and she does not want to be responsible for [A.D.]. [A.D.] is not going to school and has not been enrolled since late January 2006.

I started working this case with Autumn Moultry with DCS. Autumn was very helpful and we were working together to track [A.D.] down and find out what was going on. Autumn notified me on 02/13/06 that she would no longer be working the

27

case because Sandra Sims had a case open on [A.D.]. She said that Sandra would now be the case manager on this case.

I called Sandra Sims at the number that Autumn gave me and left a message on 02/13/06 when I got Autumn's e-mail. I hadn't heard back from Sandra by that Wednesday 02/15/06, so I sent her an e-mail in regards to the case. I explained that I needed to talk to her about the case and that I had a lot of information that needed to be passed along. I did not hear back from her. I called again the next week and left another message. She has still not contacted me in regards to this case.

I feel like this is an urgent matter, considering no one is responsible for this child. She is 12, does not go to school, has no parent or responsible adult in her life, and does not know where she will stay on a week to week basis. [A.D.] was responsible enough to call me tonight and let me know that her phone number has changed (she has a relative's cell phone). She even asked me who the DCS person was that she was supposed to talk to. Her Mental Health Co-op case manager Elaina has also been trying to contact DCS to no avail.

(Docket Entry No. 73-5, at 5).

Hopkins testified that the relevancy of this document is that it shows that A.D.'s mother had a "drug habit" and that A.D. was "forced to fend for herself," thereby "acting more mature perhaps than a 12-year-old would do."  (Docket Entry No. 96, at 25-26).

## Appendix 6

Appendix 6, which the State produced to trial counsel prior to trial, is an investigative report from Nashville General Hospital regarding the medical examination of A.D. on January 24, 2006, the day of the offense.  This report states, in relevant part, with particularly relevant portions emphasized, as follows:

Detective Baltz reports that [A.D.] left home this morning to go to school, but instead phoned a supposed 22-year-old African American male named "Little Daddy" to come pick her up. He allegedly then took her to where he stayed on Jefferson Street. He took her back to school at 3:00 p.m., and she walked home approximately two blocks. At the time that she was with Little Daddy, she engaged in penile-vaginal sex. Once she arrived home, her mother noticed a text message from someone named Kalido, who is reportedly Little Daddy's cousin, stating something to the effect that he heard that [A.D.] had had sex with his cousin. At that point, [A.D.'s mother]

began questioning [A.D.], and eventually the child stated that she had skipped school and gone to this man's apartment. Detective Baltz states that there is no other information about the alleged perpetrator and only the first name of the cousin and the phone number from which he placed the text messages. According to Detective Baltz, [A.D.] initially met these two individuals at a fast food market in East Nashville, but there allegedly had been no physical contact between Little Daddy and [A.D.] until today.

PRESENTING HISTORY: (from [A.D.'s mother])

[A.D.'s mother] states that [A.D.] got home from school early today, and when she did, she asked her why she was home early, and [A.D.] stated that she left school early because there were two girls that were threatening to beat her up. [A.D.'s mother] called the school to inquire about who these girls might be, and she wanted to come down and talk to the principal in the morning to see about protecting her child. At that point, the principal looked at the attendance roster for the day and stated that [A.D.] had not been in school today. It was then that [A.D.'s mother] began questioning [A.D.] and at some point noticed the text messaging on [A.D.'s] phone. As stated in the history from Detective Baltz, there was a heated discussion that followed, at which point [A.D.] called the police to say that her mother had slapped her. When the police came, [A.D.'s mother] reported what she had found out, and the sexual abuse detective was called out. [A.D.] was subsequently brought to General Hospital.

[A.D.'s mother] reports that [A.D.] has only been with her since October 2005 as there had been some issues in the family. [A.D.'s mother] stated she has been trying to get her life back together. [A.D.] had stayed with [A.D.'s mother's] sister until October 2005. . . . [A.D.'s mother] reports that there are many behavior issues, including a prior teacher assault . . . . She states, however, that [A.D.] was not placed in an alternative school. **[A.D.'s mother] also states that [A.D.] has told her that she had sex last summer, but [A.D.] was not in [A.D.'s mother's] custody at that time. Consequently [A.D.'s mother] does not know the age of that individual.  She further states that [A.D.] has been sexually abused by [A.D.'s mother's] stepfather [], who is currently serving a term in prison for that. She went on to say that this occurred when [A.D.] was 8 years old. She is not sure of the type of contact that occurred during the sexual abuse. She thinks it may have "only been fondling," but she is really not sure.**

MEDICAL HISTORY FROM  CHILD:

[A.D.] accompanied me to the exam room without hesitation. She did not appear to be in any acute distress.

. . . .

[A.D.] reported she takes medication for depression and to help her sleep. She did not know the name of either medication. [A.D.] reported that she does not take the medication as prescribed. She had not taken either medication for several days until this morning when she took the medication for depression. She is not taking any other medication. . . .

**[A.D.] reported she was hospitalized for 7 days at Tennessee Christian Medical Center on 12/21/05 after she intentionally took an overdose of her sleep medication. She reported no current thoughts of harming herself or another person.**

. . . .

When asked specifically about the reason for her visit to the hospital, [A.D.] reported, "I skipped school this morning and went to dude's house." [A.D] identified "Dude" as Kalindo. [A.D.] reported that she met Kalindo at a convenience store in East Nashville approximately 2 weeks ago. He picked her up across the street from her house at approximately 8:00 a.m. this morning ( 1/24/06). Kalindo drove to his house on Jefferson Street where a man [A.D.] identified as "Lil' daddy" was waiting for her. [A.D] stated, "We talked and went in the room." When asked what happened after they went in the room, [A.D.] reported, "He put it in me. We had sex.'" ([A.D.] clarified penile-vaginal penetration.) [A.D.] reported ejaculation in her vagina. [A.D.] also reported penile-oral penetration. [A.D.] specifically denied any other type of contact by the alleged perpetrator. [A.D.] reported there was no pain or bleeding associated with the incident.

The sexual contact occurred at approximately 11:00 a.m. this morning.

**When asked about prior sexual experiences, [A.D.] reported that an 18-year-old named, Lil ' Ki had penile-vaginal sex with her approximately 4 weeks prior to her hospitalization at Tennessee Christian Medical Center. She also reported that she was sexually abused by her grandmother's "step-husband" when she was 8 years old. [A.D.] said, "But that was taken care of, and he is in jail."**

(Docket Entry No. 73-6, at 2-4) (emphasis added).

On cross examination, Hopkins admitted that, based upon the information regarding A.D.'s prior sexual experiences in appendix 6, he could have filed a Rule 12 motion in limine regarding A.D.'s prior sexual conduct. (Docket Entry No. 96, at 45). Hopkins testified that he did not seek to question A.D. about her sexual history outside of the presence of the jury. Id.

With respect to the documents in the appendices that the petitioner did not receive, Hopkins testified that viewing these documents in isolation may not be as impactful as viewing them collectively.  Id. at 71.  When asked if he would have sought other witnesses in this case if he had received these other documents, Hopkins testified that "I think primary witness is the declarant regarding the issue of prostituting her daughter.  That is the biggest one I would have wanted to verify or discredit either way."  Id.  Hopkins explained, "[I]f she is someone who is not acting like a 12-and-a-half-year-old and is knowledgeable of sexual things when these two men meet her, I believe that would have gone to show that Mr. Scribner wasn't acting knowingly or recklessly with respect to her age.  She wasn't acting like a 12-and-a-half-year-old because she hadn't lived a life of a 12-and-a-half-year-old."  Id. at 75.

Following the evidentiary hearing, the parties submitted a stipulation that the petitioner's "state post-conviction counsel exercised reasonable diligence in the pursuit of any potentially exculpatory evidence under Brady," and that the date on which the factual predicate of the petitioner's Brady claim could have been discovered through the exercise of due diligence did not occur during state post-conviction counsel's representation of the petitioner.  (Docket Entry No. 100).

### 2. Law and Analysis

The statute of limitations on a Brady claim begins to run on the date the underlying facts are or could be discovered through due diligence.  Willis v. Jones, 329 F. App'x 7, 16 (6th Cir.2009).  Thus, claims based on facts that could not have been discovered until a habeas action is pending are not barred by the statute of limitations.  Similarly, suppression of evidence that prevents a petitioner

from raising claims arising from that evidence in state court can establish cause for the default of claims arising from that evidence. Hutchison v. Bell, 303 F.3d 720, 741 (6th Cir.2002); Smith v. Bell, 381 F. App'x. 547, 552 (6th Cir.2010), vacated on other grounds sub nom. Smith v. Colson, 132 S.Ct. 1790 (2012). Because "the requirements for showing cause and prejudice parallel the elements of the underlying Brady violation," Hutchison, 303 F.3d at 741, if the petitioner is able to establish a Brady violation, he necessarily overcomes both the statute of limitations and procedural default bars. Bies v. Sheldon, 775 F.3d 386, 396 (6th Cir. 2014) (explaining that cause and prejudice parallel two components of a Brady claim, "with the suppression of the evidence constituting cause and the materiality of the evidence resulting in prejudice").

By its express terms, Section 2254(d)'s constrained standard of review only applies to claims that were "adjudicated on the merits" in the state court proceeding, including instances where the state court rules against the petitioner in a summary opinion that rejects all claims without discussion, or an opinion that addresses some claims, but does not expressly address all the federal claims presented. Johnson v. Williams, --U.S.--, 133 S.Ct. 1088, 1096 (2013); Harrington, 562 U.S. 86, 98–99 (2011); Clinkscale v. Carter, 375 F.3d 430, 436 (6th Cir. 2004). Where a claim has not been adjudicated on the merits in state court but is still subject to federal review, despite the bars of exhaustion and default, "federal habeas review is not subject to the deferential standard that applies under AEDPA.... Instead, the claim is reviewed de novo." Moritz v. Lafler, 525 F. App'x 277, 282 (6th Cir. 2013) (quoting Cone v. Bell, 556 U.S. 449, 472 (2009)); accord Bies v. Sheldon, 775 F.3d 386, 395–96 (6th Cir. 2014) ("Because Bies' Brady claim was never 'adjudicated on the merits in State court proceedings,' the limitations imposed by § 2254(d) do not apply, and we review the claim de novo."); Bell v. Bell, 512 F.3d 223, 231 n.3 (6th Cir. 2008) (en banc) ("Because Tennessee

law limits an inmate to only one postconviction petition, Tenn.Code Ann. § 40-30-102(a), Bell is precluded from returning to state court to exhaust his Brady claim properly, and his claim is therefore procedurally defaulted. . . . We therefore choose to focus our attention on the merits of Bell's claim with the understanding that our decision on the merits resolves any issues as to procedural default.").

As noted <u>supra</u>, the parties stipulated that post-conviction counsel could not have discovered the alleged <u>Brady</u> material through due diligence. Given that post-conviction counsel could not have discovered the alleged <u>Brady</u> material through due diligence, logic dictates that trial counsel was equally unable to discover this evidence through due diligence.[7]

In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id</u>. at 87. "[T]here is never a real '<u>Brady</u> violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." <u>Strickler v. Greene</u>, 527 U.S. 263, 281 (1999). To establish a <u>Brady</u> violation, three conditions must be met: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler</u>, 527 U.S. at

---

[7]The respondent initially argued in its Motion to Dismiss that "[t]rial counsel's lack of diligence in pursuing relevant information that the petitioner now characterizes as "new" does not establish that the factual predicate for his claim could not have been discovered previously." (Docket Entry No. 85 at 9). Given the parties' stipulation (Docket Entry No. 100), the court deems this argument, which the respondent does not assert in its proposed findings of fact and conclusions of law (Docket Entry No. 104), abandoned.

281–82. "[T]he materiality of withheld evidence may be determined only by evaluating the evidence collectively." Castleberry v. Brigano, 349 F.3d 286, 291 (6th Cir. 2003). "Evidence that is 'merely cumulative' to evidence presented at trial is 'not material for purposes of Brady analysis.'" Brooks v. Tennessee, 626 F.3d 878, 893 (6th Cir. 2010) (quoting Carter v. Mitchell, 443 F.3d 517, 533 n.7 (6th Cir.2006)).

The petitioner argues that the documents included in appendices 3, 4, and 6 suggest that A.D. was significantly more sexually experienced than the average child of 12 years and 10 months and that this evidence would have gone to proving that the petitioner did not have the requisite *mens rea* with respect to A.D.'s age. The relevant portions in appendix 6, pertaining to the petitioner's prior sexual history, are that: (1) A.D.'s mother stated that A.D. told her that she had sex last summer [2005] when A.D. was not in A.D.'s mother's custody, and A.D.'s mother did not know the age of that individual; (2) that A.D. was sexually abused by A.D.'s mother's stepfather when A.D. was 8 years old; and (3) A.D. reported that an 18-year-old named, Lil' Ki, had penile-vaginal sex with her approximately 4 weeks prior to her hospitalization on December 21, 2005, at Tennessee Christian Medical Center, for overdosing on medication. (Docket Entry No. 73-6, at 3-4). Thus, the report reflects that A.D. was sexually abused when she was 8 years old, that she had sex in the summer of 2005, and that she had sex 4 weeks prior to her December 21, 2005 hospitalization, which would have been sometime in November or, perhaps, October, but not the summer. This would have been a few months prior to the events at issue in the criminal case.

Appendix 3 reflects that A.D. was hospitalized on December 21, 2005, as referenced in the January 24, 2006 report in appendix 6. (Docket Entry No. 73-3, at 3). The "referent," presumably the lady who brought A.D. into the hospital, alleged that A.D.'s mother had been prostituting A.D.

for a significant amount of time for income for A.D.'s mother to buy drugs.  Id.; Docket Entry No. 96, at 64-65.

Appendix 4 is the mental health assessment report that was conducted approximately six months after the crime.  As relevant information, the petitioner cites that this document reports that A.D. had 4 sexual encounters: (1) "she was molested by her grandmother's husband;" (2) in December 2005 "she was forced to have sex by a 22 year old man. She told her mother who called the police. He is now in jail;" (3) "She had consensual sex with her boyfriend;" and (4) "then one other time after custody with a 16 year old boy who her cousin set her up with, which was also consensual."  (Docket Entry No. 73-4, at 3).

Viewing these documents collectively, the court concludes that the petitioner fails to show that he suffered any prejudice by not having the documents in appendices 3 and 4.  The state trial court specifically ruled that any evidence regarding A.D.'s prior sexual activity was inadmissible under Rule 412 of the Tennessee Rules of Evidence unless she testified that she did not have any prior sexual activity.  (Docket Entry No. 31-2, State trial transcript, at 11-12).  Rule 412 provides, in pertinent part:

> Notwithstanding any other provision of law, in a criminal trial …… in which a person is accused of an offense under ….. T.C.A. § 39-13-522 [rape of a child], ….. the following rules apply:
>
> (a) Definition of Sexual Behavior. In this rule "sexual behavior" means sexual activity of the alleged victim other than the sexual act at issue in the case.
>
> (b) Reputation or Opinion. Reputation or opinion evidence of the sexual behavior of an alleged victim of such offense is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule and required by the Tennessee or United States Constitution.

(c) Specific Instances of Conduct. Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:

(1) Required by the Tennessee or United States Constitution, or

(2) Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim, [ . . .]

. . . .

(d) Procedures. If a person accused of an offense covered by this Rule intends to offer under subdivision (b) reputation or opinion evidence or under subdivision (c) specific instances of conduct of the victim, the following procedures apply:

(1) The person must file a written motion to offer such evidence. . . .

Tenn. R. Evid. 412.

The petitioner and his co-defendant were able to cross examine A.D. at trial. (Docket Entry No. 96, at 46-47). The petitioner does not submit any evidence that A.D. testified at trial that she did not have any prior sexual activity; nor did the prosecutor introduce such evidence. Thus, the petitioner fails to establish that any evidence pertaining to A.D.'s prior sexual experience would have been admissible at trial. Hopkins testified that, if he had had the information prior to trial, he could have filed a motion under Rule 412, seeking the admissibility of the documents. However, Hopkins already had the information in appendix 6 that listed A.D. having possibly 3 sexual experiences, which he could have used as the basis for a Rule 412 motion. Appendix 3 reports an unsubstantiated allegation that the mother was prostituting A.D. for drugs, but the mother denied this allegation and passed a drug screen at that time. (Docket Entry No. 73-3, at7). A.D. did not make an allegation regarding prostitution found in this document or in any other document. Nor was there any testimony or evidence at the criminal trial regarding prostitution.

Further, the report in appendix 4, which was dated six months after the crime, repeats A.D.'s sexual abuse by her step-grandfather. The report also notes that A.D. was forced to have sex with a 22-year-old man who was in jail after her mother called the police, which mirrors the facts of the criminal case. Hopkins admitted that the reference to "a 22-year old man" may have been in relation to the petitioner. (Docket Entry No. 96, at 60). The state record reflects that A.D. became acquainted with the defendants in December 2005 or January 2006 and that the petitioner was 22 years old at the time of the crime. Turner, 2009 WL 648963, at *1, 2. The report is not clear as to the date of the other two sexual encounters mentioned or if they are the same as the encounters referenced in appendix 6. Again, the petitioner was in possession of appendix 6, which lists two possible sexual encounters that occurred prior to the January 24, 2006 crime. Thus, the petitioner fails to show that he suffered any prejudice by not having appendix 4.

The petitioner also asserts that appendices 3 and 4 demonstrate that A.D. was a convincing liar. The petitioner argues that "[e]vidence tending to show that A.D. was a savvy liar, convincingly lying to adults about her sexual history, would suggest that she may have convincingly lied to Mr. Turner and Mr. Scribner, thus negating any recklessness." (Docket Entry No. 105, at 22). In support, the petitioner cites discrepancies between the December 21, 2005 incident described in appendix 3 and appendix 6. Id. at 20. In appendix 3, A.D. denied that she tried to kill herself, stating that she took 3 sleeping pills to help her sleep and that she was depressed (Docket Entry No. 73-3, at 7). In appendix 6, A.D. reported that "she intentionally took an overdose of her sleep medication" and did not have any "current thoughts of harming herself." (Docket Entry No. 73-6, at 4). The court finds this discrepancy immaterial and insufficient to show that she "convincingly lied."

The petitioner argues that the alleged misrepresentations in appendix 4 are the most relevant, as "Appendix 4 demonstrates one of two things: (1) A.D. convinced nurses that her sexual history did not include her encounter with Mr. Turner and Mr. Scribner, or (2) A.D. told nurses that her encounter was only with one man rather than two." (Docket Entry No. 105, at 21). The petitioner argues that either of these alternatives would have directly contradicted the prosecution's theory of the case that A.D. had sex with the two men and A.D.'s trial testimony. Id.

However, appendix 4 is cumulative as to the issue of lying, as the petitioner was in possession of appendix 6, wherein A.D. falsely reported to having sex with only the petitioner and to meeting the two men at a convenience store in East Nashville. (Docket Entry No. 73-6, at 2, 4). Moreover, the state record reflects that, at trial, the defense was able to challenge A.D.'s credibility and her conflicting accounts. The state record reflects the following:

> Detective Baltz testified that the victim . . . . initially mentioned only that she had engaged in penile-vaginal intercourse with Scribner but, during the course of her subsequent interviews, which occurred on February 10, February 14, and April 13, stated that she had sexual intercourse with both men.
>
> . . . .
>
> On cross-examination, Detective Baltz acknowledged that each man expressed surprise, with Scribner appearing "extremely surprised," when she revealed the victim's age. She further acknowledged that the victim initially told her that she first met Turner at a convenience store, called Scribner to come pick her up, and had vaginal intercourse with Scribner. She confirmed that the victim did not tell her that she had sexual intercourse with Turner until the February 10 interview and did not admit to having met him on a chat line, rather than in a store, until the April 13 interview. She said that the victim explained that she knew she should not have been on the adult chat line and was afraid that she would get in trouble for having used it.
>
> Detective Baltz testified that she did not ask the victim on January 24 if she had sexual relations with Turner but began to suspect as the night wore on that she had intercourse with both defendants. . . .
>
> . . . .

. . . . She denied that she told the men that she was eighteen and employed.

Turner, 2009 WL 648963, at *1-2.

Further, at the federal evidentiary hearing, Hopkins testified that he presented facts during the petitioner's criminal trial that tended to show how A.D. acted like an adult on the day of the crime, such as her participation on an adult-only chat line, her being picked up during the middle part of a school day, and her telling the petitioner that she was 16. (Docket Entry No. 96, at 69-70).

Based upon the above factual record, the court concludes that, viewing the appendices as a whole, the petitioner fails to show that he suffered any prejudice by not having some of these documents. The petitioner did have appendix 6, and he and his co-defendant were adequately able to show that A.D. lied about certain events to her mother and to investigators and that she behaved in a way that may have made her appear to be older than twelve.

For these same reasons, the court concludes that the petitioner's argument about convincing the trial court to issue a "clearer" jury instruction is without merit, as he fails to show that he was prejudiced. Here, the petitioner does not argue that the instruction was incorrect, but that his requested instruction was "likely a clearer statement of the law." (Docket Entry No. 105, at 23). This issue was addressed by the Tennessee Criminal Court of Appeals: "We agree with the State that the trial court's instructions fully and fairly stated the applicable law." Turner, 2009 WL 648963, at *9. The petitioner has not presented anything that would change that conclusion.

## V. CONCLUSION

For the reasons set forth above, the court will deny the petition, and this action will be dismissed with prejudice.

The court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. The petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the COA must "indicate which specific issue or issues satisfy the [required] showing...." 28 U.S.C. § 2253(c)(3). A "substantial showing" is made when the petitioner demonstrates that " 'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.' " Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). "[A] COA does not require a showing that the appeal will succeed." Miller-El, 537 U.S. at 337. Courts should not issue a COA as a matter of course. Id.

In this action, the court has determined that the petitioner's insufficiency of the evidence and ineffective assistance of counsel claims and the petitioner's claims in his pro se petition are time barred and that the petitioner's Brady claim is without merit. Because an appeal by the petitioner on any of the issues raised in his petition would not merit further attention, the court will deny a COA. The petitioner may, however, seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate order shall enter.

_____
Aleta A. Trauger
United States District Judge